Willie Lee **STEWART**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 12944.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 8, 1957.

Decided April 18, 1957.

---

Mr. John Alvin Croghan, Alexandria, Va. (appointed by the District Court) and Mr. Henry Carter, Washington, D. C., for appellant.

Mr. John D. Lane, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty. at the time brief was filed, Oliver Gasch, U. S. Atty., Lewis Carroll, and Frederick G. Smithson, Asst. U. S. Attys., were on the brief, for appellee.

Messrs. Abraham Krash and William Lawrence McGovern, Washington, D. C., (both appointed by this Court as amici curiae) filed a brief urging reversal.

Before EDGERTON, Chief Judge, and PRETTYMAN, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting en banc.

EDGERTON, Chief Judge, announced the judgment and division of the court as follows:

This conviction for first degree murder is reversed and the case is remanded. to the District Court for a new trial. Judges Edgerton, Bazelon, Fahy, Washington and Burger vote for reversal. Judges Prettyman, Wilbur K. Miller, Danaher and Bastian vote for affirmance. Judge Bazelon files an opinion in which Judges Edgerton, Fahy and Washington concur, and in Part I of which Judges Prettyman and Burger concur. Judge Fahy files an opinion in which Judges Edgerton, Bazelon and Washington concur. Judge Burger concurs in the result reached by the majority for the reasons expressed in Judge Fahy's opinion. Judge Bastian files a dissenting opinion in which Judges Prettyman, Wilbur K. Miller and Danaher concur.

BAZELON, Circuit Judge.

This is appellant's second appeal to this court from his conviction of first degree murder. The facts are sufficiently stated in our opinion on the former appeal.[1] In both trials the evidence made it unmistakable that, if the appellant was legally sane, he was guilty of the homicide charged against him. His principal defense, however, was insanity. We reversed the first conviction because of an erroneous instruction to the jury to the effect that "only if appellant suffered from an abnormality due to physical deterioration of or injury to the brain could he be acquitted by reason of insanity."[2]

### I.

The chief ground of the present appeal is that the two psychiatrists who testified on behalf of the prosecution based their testimony upon examination of the appellant made before we broadened the test of criminal responsibility in Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862. The psychiatric examinations, it is argued, were designed to determine appellant's cognitive powers, as required for the right-wrong test, and may not, therefore, support opinions relevant to the present test.

1. 1954, 94 U.S.App.D.C. 293, 214 F.2d 879.

2. 94 U.S.App.D.C. at page 295, 214 F. 2d. at page 882.

■ We cannot agree with this contention. The rule laid down in Durham requires no different examination by the psychiatrist, but only a different examination of the psychiatrist by the lawyers. The psychiatrists' pre-Durham examination of Stewart, if competent by medical standards, can support testimony on Stewart's mental illness, if any, and its relation, if any, to his homicidal act.

The Durham rule simply allows the psychiatrist to testify in terms of mental health or illness without being required necessarily to answer questions on what he may consider "non-medical topics [such] as 'malice,' 'right and wrong,' and 'criminal intent.' "[3] One of the purposes of the rule is to remove some of the "barrier[s] to communication between lawyers and physicians."[4] It allows greater latitude for evidence which throws material light on "whether the accused acted because of a mental disorder." Douglas v. United States, 1956, 99 U.S.App. D.C. 232, 239 F.2d 52, 58. This includes testimony, which a psychiatrist may be willing to give, that the accused did not know the difference between right and wrong when he committed the offense, or that he acted upon irresistible impulse. When such testimony exists, the jury should be instructed that it is relevant in determining whether the unlawful act was the product of mental disease or defect. Douglas v. United States, supra.

## II.

The fault we find with the present conviction is one not brought to our attention by appellant. We notice it as a plain defect affecting substantial rights.[5] Since the significance of this defect depends upon the nature of the evidence on the issue of sanity, we summarize that evidence.

The evidence of insanity introduced by the defense may be divided into two categories. First, there was testimony by appellant's wife, sister-in-law, brother-in-law and two friends or acquaintances describing acts allegedly done by appellant which seemed to have no rational explanation and which appellant seemed to forget immediately after doing them. The behavior in question included such things as trying to throw one of his children out of a window on one occasion and into a burning stove on another; with his bare fist and without apparent provocation, breaking down doors, punching a hole in a wall, and smashing a refrigerator door; cutting up and throwing away his new hat and shoes; throwing out of the window all of his household dishes and a child's piano; and sitting on and beating his pregnant wife in an attempt to squeeze the baby out. The second category of evidence was the testimony of Dr. Williams, a neuropsychiatrist who had made a two-hour examination of appellant at the District Jail three months after the alleged crime. He testified that he was unable to form a conclusion from that examination because appellant was very depressed and uncommunicative. But he said he did form a conclusion on the basis of information he obtained from other sources, including material collected by appellant's counsel. Counsel then put to Dr. Williams a hypothetical case comprising largely [6] the irrational behavior testified to by the witnesses, as hereinabove detailed, and the doctor replied that, assuming the facts to be true, appellant had been mentally ill for a number of years and would

3. Overholser, The Place of Psychiatry in the Criminal Law, 16 B.U.L.Rev. 322, 329 (1936).

4 Roche, Criminality and Mental Illness— Two Faces of the Same Coin, 22 U.Chi. L.Rev. 320, 324 (1955).

5. Rule 52(b), Fed.R.Crim.P. 18 U.S.C.A.

6. Additional matter presented to Dr. Williams in the hypothetical question and introduced in evidence at the trial was (1) the circumstances of the alleged crime; and (2) an Army record of a Weschler-Bellevue intelligence examination of appellant in 1946, showing a quotient of 63 on the verbal sub-test, 76 on the performance sub-test and a combined intelligence quotient of 65, and concluding appellant was within the feeble-minded range, though not then having any neurosis or psychosis.

probably remain so all his life. He diagnosed the illness as manic depressive psychosis.

The Government introduced in rebuttal the testimony of James Hamilton, an acquaintance of appellant, that he had never observed appellant behaving irrationally and the testimony of Drs. Klein and Kleinerman, psychiatrists who had examined appellant at the District Jail about two weeks after the alleged crime. Dr. Klein, who spent an hour with appellant, said appellant described to him what little he knew about his family background. He also said there was no necessity to talk to any one other than Stewart to obtain a family history or background. Dr. Kleinerman, whose examination of appellant took two hours, said appellant gave him a history adequate for the purpose of the examination. Both doctors testified that their examinations had shown no mental disease or defect in appellant and that, assuming the facts in the hypothetical question which had been put to Dr. Williams, appellant was not mentally ill.

The insanity defense, as is shown above, rested, in the final analysis, completely upon the testimony of appellant's relatives and friends, chiefly his wife, concerning his alleged irrational behavior. If the jury disbelieved them, that was the end of the defense, for even Dr. Williams' testimony depended upon the testimony of those witnesses.

No evidence was introduced by the Government to dispute the testimony of defendant's witnesses concerning the various incidents of irrational conduct. James Hamilton did not dispute it. He simply said that he had not seen irrational conduct. He did not claim to have been present on any of the occasions mentioned by the other witnesses. Those witnesses could, of course, have been disbelieved by the jury, either because of their demeanor or because of the natural bias in favor of the defendant which they could be expected to have. But if it is likely that an impropriety in prosecution contributed to the jury's disbelief of evidence so central and fundamental to the defense, there has not been a fair trial. Exactly such an impropriety occurred here and, on that account, the conviction must be reversed and the case remanded for a new trial.

In his closing argument to the jury, the Assistant United States Attorney correctly pointed out that Dr. Williams' testimony depended upon the truth of the testimony of appellant's relatives and friends, especially that of his wife. And he pointed out, quite permissibly, that appellant's wife "is here to do whatever she can to assist" one who "is the father of her children, her husband." Then he declared, referring to Mrs. Stewart's testimony, "All that is, I must say, are statements which I believe constitute perjury." And referring to an alleged conflict of testimony between Mrs. Stewart and her sister, he said, "It shows, I believe the complete fabrication which they have submitted to you for your consideration." True, a prosecutor's words are not prejudicial error if the jury would understand from the context that they represent merely advocacy rather than *testimony.* United States v. Battiato, 7 Cir., 1953, 204 F.2d 717. But we do not think it can be said that the jury so understood the matter because, within a few minutes after denouncing these witnesses as perjurers and fabricators, he said, referring to the testimony of Dr. Williams: "I think he was mistaken. I wouldn't assert he would testify falsely. *I wouldn't make that accusation against any witness unless I could prove it."* (Emphasis supplied.) Since the prosecutor had very recently made that accusation against Mrs. Stewart and her sister, the jury might well "believe that the prosecutor had personal knowledge" that they did testify falsely.[7] Id. at page 718.

The extent of permissible comment by the prosecutor is illustrated in our decision in Pritchett v. United States, 1950,

---

7. The perjury denunciation occurs at pp. 400–01 of the transcript and the assurance that such a denunciation would not be made unless provable, at p. 404.

87. U.S.App.D.C. 374, 376, 185 F.2d 438, 440, where the prosecutor had told the jury he thought the deceased's wife testified as she did in order to "help the defendant," the accused murderer of her husband. We said that "there must be a basis of fact for such assertions" and we found in that case that there was "ample testimony on which the Government could base such a closing statement." Cf. Ross v. United States, 6 Cir., 1950, 180 F.2d 160, 166–168 reversing a conviction upon the ground, *inter alia,* that the prosecutor, in a rhetorical question to a witness, accused him of perjury. Whether it is ever proper for a prosecutor to hurl charges of perjury at witnesses need not be decided.[8] For present purposes, it is enough to hold, as has so often been held before, that such a charge cannot be countenanced when there is nothing in the record to refute the witness' testimony. People v. Stafford, 1930, 108 Cal.App. 26, 290 P. 920; People v. Hoffman, 1948, 399 Ill. 57, 77 N.E.2d 195; Hickerson v. State, Tex.Cr.App.1956, 286 S.W.2d 437; Tyler v. State, 1904, 46 Tex.Cr.R. 10, 79 S.W. 558, 559; Annotation 1940, 127 A.L.R. 1385, 1415 et seq.[9]

In People v. Hoffman, supra, 77 N.E.2d at page 199, in reversing a conviction because the prosecutor had argued to the jury that there had been "lying and perjury" on the part of defendant's sisters and brothers who had testified on his behalf, the court quoted from one of its earlier decisions [10] this statement of the rule:

"It is legitimate argument, if the state's attorney so believes, to tell the jury *the state's witnesses told the truth and are more credible than those for the defendant;* but it is improper for him to express his own individual opinion or belief of defendant's guilt, *except as that opinion is based on the evidence.*" [Emphasis supplied.]

Where, as here, there are no witnesses contradicting the testimony of the witnesses called perjurers and fabricators, there is no question of comparative credibility. Since the prosecutor's statement here was not "based on the evidence," it was forbidden by the rule. It amounted to unsworn testimony by the prosecution. People v. Hoffman, supra; Harper v. State, 1951, 94 Okl.Cr.R. 371, 236 P.2d 272, 275; Commonwealth v. Maloney, 1950, 365 Pa. 1, 73 A.2d 707, 709–710.

Such statements to the jury by the prosecutor are the more prejudicial because their impact on the jury "is always more or less strengthened by his official position * * *." Commonwealth v. Cook, 1888, 86 Ky. 663, 7 S.W. 155, 156.[11] The administration of justice re-

8. Such conduct has been called "improper and reprehensible." State v. Horr, 1923, 63 Utah 22, 221 P. 867, 875–876. See also State v. Moran, 1923, 99 Conn. 115, 121 A. 277, 36 A.L.R. 862; Elliott v. State, 1931, 117 Tex.Cr.R. 180, 36 S.W.2d 513; People v. Duncan, 1914, 261 Ill. 339, 103 N.E. 1043, 1049–1050. And note in Hernandez v. State, 1945, 156 Fla. 356, 22 So.2d 781; that, even where the witness contradicts the story he has earlier given the police, the prosecutor may confront him with his earlier statement, but may not say, in the jury's hearing, that the witness perjured himself.

9. See also Morrison v. Smith, Tex.Civ. App.1940, 138 S.W.2d 280, 283, reversing a personal injury damage judgment because an "argument which imputes perjury to witnesses and subornation of per-

jury to counsel of adverse litigant is not to be taken lightly when it is not sustained by the testimony or reasonable inferences therefrom."

Compare State v. Jackson, 1935, 336 Mo. 1069, 83 S.W.2d 87, 103 A.L.R. 339, where the prosecutor was permitted to call perjury the testimony of a witness who had been flatly contradicted by another; and United States v. Marino, 2 Cir., 1944, 141 F.2d 771, 774, where an argument tending to raise an issue as to the comparative veracity of witnesses was held justified by the evidence.

10. People v. Black, 1925, 317 Ill. 603, 148 N.E. 281, 287.

11. See People v. Stratton, 1955, 286 App. Div. 323, 143 N.Y.S.2d 362, 365–366; People v. McGee, 1914, 24 Cal.App. 563, 141 P. 1055, 1058.

quires that the obligations which the United States Attorney carries into the courtroom, as representative of an impartial sovereign, be faithfully observed. "It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Berger v. United States, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314.

Since the testimony which the prosecutor denounced as perjurious was the cornerstone of the defense of insanity, his improper conduct was so prejudicial [12] as to constitute the type of error for which we have a duty to reverse though the point has not been raised by the parties.[13]

This is the second reversal of appellant's conviction of this crime. "But the standards of justice cannot be relaxed in such a situation: the fact that an accused has undergone more than one trial does not dilute his right to just and lawful treatment. See Leyra v. Denno, 1954, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948." Caldwell v. United States, 1955, 95 U.S. App.D.C. 35, 38, 218 F.2d 370, 372 (Judge Washington, dissenting).

FAHY, Circuit Judge.

 It is clear from the division within the Court and from the content of Judge BAZELON'S opinion and the dissenting opinion of Judge BASTIAN that a difficult question is presented. The crime charged and the manner of its commission were appalling. Nevertheless, appellant's defense of insanity had substance. It follows that before his life is taken by the state that question must be decided adversely to him in a manner deemed by the law to be fair. It is here that members of the Court find a doubt which is serious enough to necessitate a new trial. This doubt arises by reason of the argument of the prosecuting attorney to the jury indicating personal knowledge of perjury by a defense witness in testifying to events bearing on the defense of insanity. The doubt thus created is not eliminated by general statements of the prosecuting attorney at the beginning of his argument, not directed to this particular matter, that the jury are the sole judges of the facts, nor by general instructions of the trial judge of similar import. In a capital case specific error of serious character may not be disregarded because of scrupulous correctness of the trial in other respects. The fact is that on the whole this was a well conducted trial. But the judicial process includes an appeal, and in a capital case the appellate court is called upon to perform its own special function, which cannot be delegated. Under long established principles we scrutinize the record in a capital case with the utmost care to satisfy ourselves of the absence of serious error not called to our attention by counsel for the appellant. Collazo v. United States, 90 U.S.App.D.C. 241, 253, 196 F.2d 573, 585. And see Fisher v. United

---

12. Cf. People v. Duncan, supra note 8, which, though declaring reprehensible a prosecutor's conduct in letting the jury hear him ask for the arrest of a defense witness for perjury, held the error not prejudicial because the witness' testimony had been confined to minor matters.

13. "In a case like this, it would better accord with the rights of the accused for the court to suggest to him or to his counsel that if he desired it, and would so request, the jury would be withdrawn and another jury impaneled to try the case. *If the suggestion*

*should be declined, the complaint of the accused should not thereafter be heard."* Commonwealth v. Cook, 1888, 86 Ky. 663, 7 S.W. 155, 156, emphasis supplied. See also Lewis v. State, 1892, 89 Ga. 396, 15 S.E. 489, where a seduction conviction was reversed upon the ground, *inter alia*, that the prosecutor had said in the jury's hearing that he would prosecute a defense witness for fornication, even though there had been no objection and no request for an instruction to the jury to disregard the improper remark.

States, 328 U.S. 463, 468, 66 S.Ct. 1318, 90 L.Ed. 1382.

We reverse not for mere technical error or for failure of conformity with niceties of procedure, but for error which leaves serious doubt in our minds as to the validity of the conviction. This presents us with no alternative but to hold that the accused is not to be executed unless that serious doubt is removed. We imply no criticism of the trial judge or of defense counsel; we do not accuse the prosecuting attorney of unprofessional or unethical conduct. With the opportunity for greater deliberation than they, we simply perform our duty according to our own judicial conscience.

I am authorized to say that Chief Judge EDGERTON and Circuit Judges BAZELON and WASHINGTON concur in this opinion.

BASTIAN, Circuit Judge, with whom PRETTYMAN, WILBUR K. MILLER and DANAHER, Circuit Judges, join, (dissenting).

This dissent is addressed to Part II of Judge Bazelon's opinion, as we agree with the result reached by the majority on Part I.

Part II has to do with alleged misconduct on the part of the prosecuting attorney in his closing argument to the jury. As stated in Judge Bazelon's opinion, error on this ground was not claimed by appellant (defendant) in this court nor was objection made at the trial of the case.

In order that the full picture may be painted, it is necessary to set out in some detail the atrocious crime with which the defendant was charged and which the evidence made unmistakable that he had committed.

On the night of March 12, 1953, the defendant entered a grocery store at 723 East Capitol Street in the District of Columbia. The store was owned by one Harry Honikman and there were present at the time of Stewart's entry into the store (ostensibly as a customer), Honikman, his wife and his daughter. Defend-

ant ordered a bottle of soda and a bag of potato chips and, as well, a bottle of soda to take out. As Honikman reached for a bag in which to put the bottle of soda, Stewart walked toward the door of the store but turned back and, gun in hand, stated: "O. K. This is it." The daughter screamed, or "hollered," to her father: "Give him the money!" The mother also screamed: "Take the money; here is the register, take the money." Honikman, completely deaf in one ear, hesitated and said: "Do you want the money?" Whereupon, Stewart shot, the bullet passing through Honikman's heart and lungs, fatally injuring him. With Honikman on the floor, attended by his hysterical wife, Stewart went behind the counter, moving a candy counter in order to get past a rocking chair, to get to the cash register. He took something over $400.00 from the register and walked out of the store calmly, closing the door behind him. Thereafter, he returned to a card game in which he had been engaged prior to the crime and continued the game. Shortly after his arrest he was identified by witnesses as the perpetrator of the crime. The fact that Stewart's fingerprints were found on the bottle of soda and on the bag of potato chips consumed by the person committing the offense is conclusive that Stewart was that person. Ballistics experts testified that the bullet removed from Honikman's body had been fired from Stewart's revolver.

As stated in the opinion of this court reversing appellant's first conviction of first degree murder [1954, 94 U.S.App. D.C. 293, 214 F.2d 879, 882], while the defenses were lack of identification and insanity, the main reliance was on the latter defense. The reversal of the first conviction was based on what this court considered to be an erroneous instruction to the jury, to the effect that "only if appellant suffered from an abnormality due to physical deterioration of or injury to the brain could he be acquitted by reason of insanity."

The evidence presented at the second trial was conflicting as to Stewart's san-

ity. On behalf of the defendant there was lay testimony from a friend of the defendant, defendant's wife, his sister-in-law, and the husband of the sister-in-law, and testimony of a psychiatrist. The Government's witnesses, among others, consisted of two psychiatrists and a lay witness. In addition, the defendant presented portions of a War Department summary of his military service record. Some detail is required as to the testimony in order to present the situation as it existed at the time of the argument to the jury.

The witness Hill testified that he had known the defendant for about four years prior to the killing; had seen him each week; that, on one job, defendant carried twelve or thirteen cinder blocks instead of the eight required by union regulations; that the defendant got into an argument with a lady who had invited the witness to dinner and had not included the defendant; and that, in playing cards with Stewart, the latter sometimes would want to fight "just over nothing."

Defendant's wife testified that in 1948 Stewart without reason struck his fist through a wall of the apartment in which they were living; that, when she was pregnant with her second child, Stewart used to come in from work and "grab me out of bed and sit on me;" that he said "he would mash that damn baby out of me;" that he broke down the door of her room with his fists; threw all the dishes out of the window; wanted to throw a crying baby out of the window because he could not stand the noise; all of which acts the defendant denied when later she charged him with them. The witness admitted she had not at any time complained to the police, and had not had her husband taken to a physician or hospital.

Defendant's sister-in-law testified as to certain actions of the defendant which she said he later denied, one of them being that she once saw him pick up one of his five children and threaten to throw it into a burning stove because the baby was crying.

The witness Coleman testified that Stewart had been known to beat on a refrigerator with his fists, and had done certain other things, including attempted "affairs" with her, which later the defendant denied.

The husband of defendant's sister-in-law testified that Stewart threw their child's piano out of the window but, on cross-examination, stated that he had stopped Stewart in an attempt to do this.

A court martial record indicated that Stewart had served in the Army from January 1943 to November 1945, when he was honorably discharged, and that he reenlisted the next day. While in the Army Stewart received a Bronze Star Award. Although the finding of an intelligence examination indicated that defendant's intelligence fell within the feeble-minded range and that he was semi-illiterate, there was no evidence that a neurosis or psychosis was present or that he was not mentally adequate.

The psychiatrist presented by the defense was Dr. E. Y. Williams, who examined the defendant at the District jail for about two hours some three months after the crime. The psychiatrist was unable to form a conclusion as to defendant's mental condition as a result of that examination, and testified that during the two-hour examination defendant was uncommunicative and told him very little. In response to a hypothetical question setting forth the circumstances of the crime, the testimony of the lay witnesses, and the War Department record, Dr. Williams stated that from the history given him in the hypothetical question he would say that "this man was ill for most of his natural life and most likely will be for the rest of his life" and that his diagnosis was "manic depressive psychosis, mostly in the manic phase." It is abundantly clear that this diagnosis was based almost entirely on the information given Dr. Williams by defendant's counsel and family.

Drs. Elmer Klein and Morris Kleinerman, qualified psychiatrists, testified for the Government. From their examina-

tions of the defendant, they concluded that Stewart was not suffering from a mental disease or defect and that there was no indication of any prior illness of a manic depressive nature. Dr. Klein stated that he found no psychosis or neurosis present. Dr. Kleinerman came to his conclusion on the basis of his examination of defendant and a hypothetical question which assumed certain conduct attributed to Stewart by the defense witnesses. Both Dr. Klein and Dr. Kleinerman testified that Stewart talked freely with them, and described him as cooperative. They found his attitude to be quite different from that which Dr. Williams said he encountered.

The witness Hamilton testified that he had known Stewart for approximately six years and was with him on the day of the crime; that he and Stewart were very good friends; that, except for one occasion when Stewart was drunk, he had never seen Stewart act peculiarly or abnormally; that Stewart was normal when in his presence.

Judge Bazelon's opinion comments that no evidence was introduced to dispute the testimony of defendant's witnesses concerning the alleged violent actions of Stewart.

We do not agree. The admission of defendant's wife that no complaint of the alleged violent acts had ever been made to the police, a doctor or hospital, and the testimony of defendant's "very good friend," Hamilton, that in the course of six years' close association with defendant he had never observed any violent, aberrational conduct on defendant's part except on one occasion when he was drunk, are matters of record which leave the truth of the testimony of defendant's wife and his sister-in-law seriously in doubt. If defendant had in fact engaged in the violent conduct which induced Dr. Williams' belief that he was manic depressive, his good friend and close associate, Hamilton, logically would have observed some acts of compulsive violence. Yet Hamilton said he had witnessed no such conduct. Add to this the interest of the wife in saving her husband, the less

close but still substantial interest of defendant's sister-in-law and the fact that her testimony was impeached by a showing of a prior conviction, and it is patently clear that there were reasonable, substantial grounds for imputing false testimony to these two defense witnesses. Naturally, the jury was not in any event bound to believe the defendant's witnesses. Certainly, in this record there is ample reason for saying that the jury should not have believed them.

Having heard the evidence, the jury returned a verdict of guilty of murder in the first degree. The validity of appellant's conviction is now questioned because of alleged misconduct of the Assistant United States Attorney in his closing argument to the jury. In the course of that argument he asserted, in relation to the testimony of appellant's wife: "All that is, I must say, are statements which *I believe* constitute perjury." [Emphasis supplied.] In referring to an alleged conflict between the testimony of the wife and that of appellant's sister-in-law, he said: "It shows, *I believe*, the complete fabrication which they have submitted to you for your consideration." [Emphasis supplied.] Later in his argument, referring to the testimony of the defense psychiatrist, the prosecutor said: "I think he was mistaken. I wouldn't *assert* he would testify falsely. I wouldn't make that accusation against any witness unless I could prove it." [Emphasis supplied.]

It should be noted in evaluating this record that appellant was represented by experienced counsel, who conducted his defense with zeal and effectiveness, but he did not object to the prosecutor's remarks when they were made. He did not raise objection to them in support of a motion for new trial. Objection to them was not raised by counsel who succeeded the trial counsel as a basis for reversal on appeal. The prosecutor's remarks were raised as a basis for reversal in this court and by this court.

Now that the essential facts have been stated, it is necessary to examine the fundamental principles of law relating to

alleged misconduct of prosecutors. We consult these principles to determine if the conduct detailed above was legal error and, if so, whether it was prejudicial or reversible error. Collateral to and interwoven with those questions is the effect of failure to object to the conduct now under attack.

The cases disclose that alleged misconduct of a prosecutor in his argument to a jury is generally founded on a claim that he departed from his role as advocate by testifying as a witness not under oath and not subject to cross-examination, or that his argument was so grossly, excessively inflammatory and his vilification of the defendant and his witnesses so extreme as to induce the jury to forsake the record and decide the issues on the basis of passion and prejudice. Of course, there are cases where it was alleged as error that the prosecutor had done both. For examples of the nature of conduct generally alleged as improper see United States v. Socony Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Dunlop v. United States, 1897, 165 U.S. 486, 17 S.Ct. 375, 41 L.Ed. 799; Mellor v. United States, 8 Cir., 1947, 160 F.2d 757; Pietch v. United States, 10 Cir., 1940, 110 F.2d 817, 129 A.L.R. 563; Borgia v. United States, 9 Cir., 78 F.2d 550, certiorari denied, 1935, 296 U.S. 615, 56 S.Ct. 135, 80 L.Ed. 436; DeBonis v. United States, 6 Cir., 1931, 54 F.2d 3, certiorari denied, 1932, 285 U.S. 558, 52 S.Ct. 458, 76 L.Ed. 946; People v. Stafford, 1930, 108 Cal.App. 26, 290 P. 920; People v. Black, 1925, 317 Ill. 603, 148 N.E. 281.

Whether there has been error because the prosecutor assumed the role of a witness is based upon whether he has indicated to the jury matters of his own personal knowledge not presented in evidence or not a reasonable inference from the record. If the prosecutor communicates a personal belief in some state of fact, the better and prevailing view is that there is no error so long as the evidence and all reasonable inferences from it support his stated belief. See Kemp v. United States, 8 Cir., 160 F.2d 406, certiorari denied, 1947, 331 U.S. 843, 67 S.Ct. 1534, 91 L.Ed. 1864; Mellor v. United States, supra; Malone v. United States, 7 Cir., 94 F.2d 281, certiorari denied, 1938, 304 U.S. 562, 58 S.Ct. 944, 82 L.Ed. 1529; United States v. Wexler, 2 Cir., 1935, 79 F.2d 526, certiorari denied, 1936, 297 U.S. 703, 56 S.Ct. 384, 80 L.Ed. 991; Borgia v. United States, supra; La Feber v. United States, 8 Cir., 1932, 59 F.2d 588; Portman v. United States, 8 Cir., 1929, 34 F.2d 406; Gray v. United States, 8 Cir., 1926, 14 F.2d 366; Chadwick v. United States, 6 Cir., 1905, 141 F. 225; People v. Johnson, 1935, 11 Cal.App.2d 22, 52 P.2d 964; Compton v. State, 1926, 105 Tex.Cr.R. 516, 289 S.W. 54.

There are numerous cases which have upheld criminal convictions where the prosecutor stated that he knew or was convinced of a defendant's guilt, that a defense witness was lying, that an alibi was false, etc., so long as the conclusion stated had some evidence supporting it in the record. For examples of such cases see Schmidt v. United States, 8 Cir., 1956, 237 F.2d 542; Henderson v. United States, 6 Cir., 218 F.2d 14, certiorari denied, 1955, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253; [1] United States v. Battiato, 7 Cir., 204 F.2d 717, certiorari denied, 1953, 346 U.S. 871, 74 S.Ct. 118, 98 L.Ed. 380; United States v. Klein, 7 Cir., 187 F.2d 783, certiorari denied, 1951, 341 U.S. 952, 71 S.Ct. 1021, 95 L.Ed. 1374; United States v. Holt, 7 Cir., 108

[1]. At page 19, of 218 F.2d the court said: "It is of course permissible for the district attorney to ask the jury for a conviction. Nichamin v. United States, 6 Cir., 263 F. 880, 882. In doing so the district attorney has the right to summarize the evidence and urge upon the jury all reasonable inferences and deductions from the evidence. It is not misconduct on his part to *express* his individual belief in the guilt of the accused if such belief is based solely on the evidence introduced and the jury is not led to believe that there is other evidence, known to the prosecutor but not introduced, justifying that belief. [Citing cases.]"

F.2d 365, certiorari denied, 1939, 309 U.S. 672, 60 S.Ct. 616, 84 L.Ed. 1018; People v. Johnson, supra; Compton v. State, supra.

For alleged misconduct because of abusive, inflammatory language to be error it must be shown to have been more than an isolated indulgence in the lurid or just any invocation of passion. To amount to legal error such conduct must be repeated, extreme, reckless and without regard for a trial based upon the evidence. See United States v. Socony Vacuum Oil Co., supra; DeLorenzo v. United States, 95 U.S.App.D.C. 74, 219 F.2d 506, certiorari denied, 1955, 349 U.S. 964, 75 S.Ct. 897, 99 L.Ed. 1286; McFarland v. United States, 80 U.S. App.D.C. 196, 150 F.2d 593, certiorari denied, 1945, 326 U.S. 788, 66 S.Ct. 472, 90 L.Ed. 478; Funk v. United States, 16 App.D.C. 478, certiorari denied, 1900, 179 U.S. 683, 21 S.Ct. 916, 45 L.Ed. 385; United States v. Achilli, 7 Cir., 234 F.2d 797, certiorari denied, 1956, 352 U.S. 916, 77 S.Ct. 214, 1 L.Ed.2d 122, upon reconsideration, certiorari granted on question not pertinent here, 1957, 352 U.S. 1023, 77 S.Ct. 588, 1 L.Ed.2d 595; Beard v. United States, 4 Cir., 222 F.2d 84, certiorari denied, 1955, 350 U.S. 846, 76 S.Ct. 48, 100 L.Ed. 753; Mellor v. United States, supra; Pietch v. United States, supra; Chadwick v. United States, supra.

Nothing has been said in support of reversal here which in any way suggests that the prosecutor attempted to induce the jury to resolve the issues on the basis of passion and prejudice. On the contrary, the record is completely and absolutely devoid of any conduct on his part which could fairly be called an improper appeal to passion or prejudice. Therefore, we properly restrict our inquiry to the question of whether the prosecutor's statement of a belief that witnesses had committed perjury was legal error and, if so, whether such statement is a proper basis for reversal.

Our review of the authorities in this area indicates that there is no reversible error in a prosecutor's stating his conclusion on the guilt of a defendant or the falsity of a witness's testimony so long as the conclusion is drawn from evidence in the record. Error occurs where a prosecutor induces the jury to believe that his conclusion, belief or knowledge is based on matters not available to them in the record. The first situation is legitimate advocacy; the second is improper testimony by an unsworn witness who is not amenable to cross-examination. The first instance discloses no error; the second does.

Returning to the case at hand, into which category does the prosecutor's conduct fall—error or non-error? We believe the alleged "misconduct," if it may be so denominated (and we do not think it may be so denominated), clearly was not error justifying reversal. The prosecutor stated that in his belief the witnesses had lied. Even if his later statement in relation to the testimony of the expert witness for the defense is to be directly related to his separate, independent comment on the truth of the other two witnesses' testimony,[2] it amounts simply to a statement of his belief, based on the record, that the prior witnesses had lied. Nowhere in the record can there be found any remark or insinuation indicating that his belief was based on anything other than the evidence and the inferences to be drawn from it. The fact that his belief could not be proven beyond logical contradiction or that it might not, on the basis of the record, sustain a conviction

2. The organization of the prosecutor's argument indicates that the statement that he would not accuse a witness of testifying falsely, unless he could prove it, was not related to or designed to be connected with his earlier statements regarding his belief that defense testimony was perjurious. His argument consisted of comments on the testimony of all the witnesses. He reviewed the testimony of all witnesses, one by one, and commented on it in the light most favorable to the Government's case. As he was commenting on the testimony of each witness in turn, we are unable to assume that the later statement was meant to be or logically should be connected with his previous statements.

of perjury does not make the statement error. If this were the case, every prosecutor would be guilty of misconduct when he urged the Government's position. Even if the questioned statement was extravagant (and we do not think it was), that does not make it error.

The record indicates the remarks regarding perjury were made at the point in argument during which the prosecutor was commenting on the reliability of witnesses, and during which he pointed out the natural interest of appellant's wife in the case, the fact that she had never reported his violent conduct to the authorities, and the "straightforward," unbiased testimony of appellant's friend that appellant conducted himself in a normal manner. It is only logical to assume that the prosecutor's statement that he believed the wife and sister-in-law committed perjury, was based on matters in evidence and inferences from it. Absolutley nothing was said in support of his controversial statement which was not a part of the testimony in the case. There was no suggestion that he had some secret, personal knowledge in support of his statements for which the jury had to take his word. In fact, he told the jury in unmistakable terms that his statements were "not evidentiary in the slightest degree." See page 54 of 247 F.2d infra. Certainly this negatives any idea that he intimated that he had some secret, personal knowledge in support of his statement.

If we have dwelt at some length on this matter it is because we regard it as the crux of this case. We are convinced for the reasons set forth that there was no legal error in the remarks complained of by this court.

Assuming *arguendo* that the prosecutor did exceed the proper limits of advocacy and became an unsworn witness, we would still be faced with the question of whether any legal error committed was prejudicial and a basis for reversal.

The answer to this question depends upon a number of variables. Chief among them are how flagrant was the prosecutor's misconduct; the emotional and psychological climate prevailing at trial; and what was said by the trial judge, defense counsel, or the prosecutor himself to mitigate or obviate the prejudice to appellant. Considering these elements we cannot say the appellant here was prejudiced, even assuming *arguendo* that the conduct complained of constituted technical legal error. Our conclusion is dictated by a number of factors:

First, the conduct complained of cannot fairly be called flagrant. The statements were not made repeatedly nor did the prosecutor dwell upon the matter. The conduct consisted merely of isolated statements made during the course of trial and in connection with the important element of credibility of witnesses. Furthermore, the statements were of the prosecutor's belief and not of facts. If the later comment that he would not accuse a witness of lying unless he could prove it is related to his statement that the two other witnesses had committed perjury, the prosecutor still had said nothing to indicate that his knowledge was not based on inferences from the record. Thus, if there was error it was not flagrant or calculated to dissuade the jury from deciding the issues of fact on the basis of the record. It was, if error at all, a narrow technical error.

Secondly, the emotional and psychological climate attending the trial was not such as to raise any error to the level where it was prejudicial. The record discloses an eminently fair, impartial, non-inflammatory proceeding. This is particularly striking, in view of the lurid, cold-blooded nature of the crime. Apart from the prosecutor's comments in argument now complained of, no other misconduct is alleged and certainly none has been disclosed. Thus, placing the prosecutor's comments in the context of a fair, dispassionate, well controlled trial does not aggravate the effect of those comments. The conduct of the trial judge was marked with patience and every attention to the rights of the accused. She adhered to the instructions

of this court laid down in Durham [3] and it is hard to see, on examination of the record, how defendant could have had a fairer trial. Thus, the manner in which the trial was conducted, the emotional context at the trial, and the prosecutor's general conduct would minimize the error, assuming once again that there was some technical legal error, which once again we say there was not.

Thirdly, our conclusion that the remarks were not prejudicial was arrived at by considering the effect of other statements of the prosecutor on the comments complained of, the curative effect of the trial court's instructions, and the failure of the defense counsel to interpose any objection or to indicate a belief that his client had been prejudiced.

Beginning his argument to the jury, the prosecutor asserted:

"No bias, no prejudice or no sympathy should enter into your deliberations. You are governed by the facts which you have heard for three days from the witness stand here in this court and in accordance with her Honor's instructions as to what the law governing this case is. * *

"I want to impress upon you the fact that my recollection, *my statements to you, are not evidentiary in the slightest degree* and if I make any misstatement, please accept my humble apology. It is meant, and only meant, to be my statement. It is not governing on you. It has no effect on your deliberations. You should disregard my recollection if by virtue of your recollection it be wrong. * * * [Emphasis supplied.]

"You can accept the testimony of the Government psychiatrist or the defense psychiatrist, either or both or neither, because you are the triers of the facts, and ultimately it is your decision to make, whether or not you will believe one or the other, or none of them. You are the triers of the facts, and that is a fact for you."

Later in the course of his argument, the prosecutor told the jury:

"Now, Ladies and Gentlemen, they say he was not normal. They base that on some alleged statements by these witnesses.

"He refers to Coleman, the food in the refrigerator, that wouldn't be a normal thing; the things he was supposed to have done to his children would not be normal.

"They ask you to assume that those relatives, Betty Whorton—recall if you will, that Betty Whorton was admittedly convicted of abortion. That was brought out for one reason, to give you some basis to judge her credibility, and that is the only purpose.

"Anna Lee Stewart, the wife of the defendant, other relatives, the people he played cards with, they have all testified to these alleged things.

"What about the one man, James Hamilton? You observed him on the stand. You observed the manner in which he answered the questions. He impressed me and I believe he will have impressed you when you consider his testimony. Mind you well, his testimony was accurate, forthright. I believe if you will recall his statement—'I am no psychiatrist—I don't know whether he was of sound or unsound mind, but he acted normal to me and I never heard all these stories until this thing arose.'

"But they say he is not normal. They say this incident of the porch and the incident where he went out of the window because the porch was being repaired, and that he would not go down through the basement. * * *

"I say he was basing his answer, and I think he was really mistaken—he was basing his answer on a lot of fallacious material given to him by

3. Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862.

friends and relatives on the stand as a part of a hypothetical question."

If the comments on the credibility of defense testimony was legal error, how can it be said to have been prejudicial error and the occasion for reversal in view of these statements by the prosecutor himself? If there was error, it was because, instead of arguing, he testified before the jury or because, in some way, he inferred some matters not in evidence. Yet, the Government's attorney emphasized strongly and repeatedly that nothing he said was "evidentiary" or governing and should have no effect on the jury's deliberations.

There are numerous decisions which take the position that error arising from improper argument can be cured by countervailing comment, by admonishing the jury to disregard the improper argument and not to treat it as evidence, or by instruction to the jury as to the function and purpose of argument. For cases recognizing this principle see Dunlop v. United States, supra; United States v. Moran, 2 Cir., 194 F.2d 623, certiorari denied, 1952, 343 U.S. 965, 72 S.Ct. 1058, 96 L.Ed. 1362; Baker v. United States, 8 Cir., 1940, 115 F.2d 533; Dale v. United States, 7 Cir., 1933, 66 F.2d 666, reversed on other grounds, Massey v. U. S., 1934, 291 U.S. 608, 54 S.Ct. 532, 78 L. Ed. 1019; Dunn v. United States, 9 Cir., 50 F.2d 779, affirmed, 1931, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356; Vendetti v. United States, 9 Cir., 1930, 45 F.2d 543; Lau v. United States, 8 Cir., 13 F.2d 975, certiorari denied, 1926, 273 U.S. 739, 47 S.Ct. 332, 71 L.Ed. 867; Chadwick v. United States, supra; De Hority v. State, 1939, 215 Ind. 390, 19 N.E.2d 945; Gunnells v. State, 1912, 7 Okl.Cr. 98, 122 P. 264.

We regard the prosecutor's remarks set out above as sufficient to have cured any error of law which might have arisen because of his comments on the credibility of defense witnesses.

If this were not sufficient to cure the assumed error, there is also the fact that the trial judge, at the very outset of her instructions to the jury, told them:

"You, and you alone, are the judges of the facts in this case. You are to determine what the facts are from the evidence in the case. The evidence in the case consists of the testimony which you have heard from the lips of the witnesses who have taken the stand here, the deposition of an absent witness which was read to you by stipulation of counsel, the exhibits which have been shown to you during the trial.

"The stipulations of counsel which have been stated to you in open court are also to be regarded as evidence in the case.

"After you have here determined for us what the facts are in the case you then apply to those facts the law as given to you by the Judge and then you return a verdict.

"What the lawyers say to you is not evidence. What the Judge says to you is not evidence. If anything has been said by the attorneys or is said by the judge which is not in accordance with your recollection of the testimony, then you are to be governed by your recollection.

"Each attorney in this case is an able attorney and you may find the arguments of the lawyers helpful to you in marshaling the facts. You are to bear in mind, however, that *what an attorney says is not evidence* and is to be viewed in the light of the fact that each attorney is the representative of his particular side. [Emphasis supplied.]

"You are to decide this case without sympathy and without prejudice for or against any party to this action. Your verdict is to be based solely upon the evidence in the case and instructions which will be given to you by the judge as to the law.

"In determining the facts in the case you are obliged to determine the credibility of each witness who

appeared here before you. That means that you are to determine to what extent to believe each witness. * * *

"You should consider such expert opinion and should weigh the reasons, if any, given for it.

"You are not, however, bound by such an opinion.

"You may give it such weight as you deem it is entitled to receive, whether that be great or slight. And you may reject it if in your judgment the reasons given for it are unsound.

"An expert may give his opinion based on a hypothetical question. Such a question is one put by an attorney wherein he asks the expert witness to assume certain facts which usually the attorney putting the question maintains have been shown by the evidence in the case and then to give an opinion on a particular issue based on such assumed facts.

"Now it is for the jury to say whether such assumed facts have been shown by the evidence in the case. * * * "

So long as there exists a rule that errors of the type alleged may be corrected by proper admonition to the jury, we see no sound basis for calling the assumed error now under discussion prejudicial or a basis for reversal. Furthermore, we are impressed by the fact that appellant's experienced counsel could have interposed some objection if, under the circumstances of the trial referred to above, the Government attorney's remarks were prejudicial to his client. That one chiefly responsible for the protection of the accused did not object is persuasive that the alleged misconduct was not prejudicial.[4] Defense counsel was present; he heard the statements this court has questioned; he was aware

of the emotional and psychological atmosphere prevailing at the trial; he, and not this court, was the principal reliance of his client in protecting appellant's legal rights. He did not object. Can this court, which has before it only paper and ink, determine better than he whether the prosecutor's remarks prejudiced appellant's case? We think not.

Research indicates that, in order to be available as a basis for reversal on appeal, alleged improper argument should be objected to at trial. Cf. United States v. Socony Vacuum Oil Co., supra; United States v. Mathison, 7 Cir., 1956, 239 F.2d 358; O'Malley v. United States, 1 Cir., 1955, 227 F.2d 332; United States v. Klein, supra; Heald v. United States, 10 Cir., 175 F.2d 878, certiorari denied, 1949, 338 U.S. 859, 70 S.Ct. 101, 94 L. Ed. 526; Young v. United States, 10 Cir., 168 F.2d 242, certiorari denied, 1948, 334 U.S. 859, 68 S.Ct. 1533, 92 L. Ed. 1780; United States v. Skidmore, 7 Cir., 1941, 123 F.2d 604, certiorari denied, 1942, 315 U.S. 800, 62 S.Ct. 626, 86 L.Ed. 1201; Pietch v. United States, supra; People v. Johnson, supra; People v. Simon, 1927, 80 Cal.App. 675, 252 P. 758.

The basis for this rule is that a party should not be permitted to gamble on the possibility of a favorable verdict and then, when a verdict of guilty is returned, attack it because of alleged errors which could have been obviated had he interposed a timely objection. Cf. Pacman v. United States, 9 Cir., 144 F.2d 562, certiorari denied, 1944, 323 U.S. 786, 65 S.Ct. 278, 89 L.Ed. 627; United States v. Goodman, supra; Paschen v. United States, 7 Cir., 1934, 70 F.2d 491; Dale v. United States, supra; Vendetti v. United States, supra; Carlisle v. United States, 4 Cir., 1912, 194 F. 827; People v. Stafford, supra; People v. Simon, supra.

True, isolated cases may be found where judgments have been reversed on

4. Shelton v. United States, 83 U.S.App. D.C. 257, 169 F.2d 665, certiorari denied, 1948, 335 U.S. 834, 69 S.Ct. 24, 93 L.Ed. 387; United States v. Goodman,

7 Cir., 1940, 110 F.2d 390; Malone v. United States, supra; Dale v. United States, supra.

grounds of improper argument where no objection was made at trial.[5] Those cases can be explained on the basis that the error arose from grossly excessive and flagrantly improper conduct of counsel, and that it was likely that nothing could be said which would prevent the defendant's case from being prejudiced. See People v. Simon, supra, quoted in People v. Stafford, supra. Certainly, it cannot be said that any prejudice accruing to appellant because of the misconduct alleged here could not have been wiped out by proper comment to the jury. Therefore, the instant case is not one in which reversal is proper where no objection was made.

We are reluctant, naturally, to rest our decision on the somewhat narrow and technical ground of failure to object, particularly with Rule 52(b) of the Federal Rules of Criminal Procedure in mind. This reluctance is not dispelled by the fact that most of the decisions in this area regard timely objection as a condition precedent to alleged misconduct being noticed on appeal.

But this rule is not our principal reliance. Our conclusion that this conviction should be sustained is based upon all the circumstances alluded to above, as they bear on the question of whether the alleged misconduct was error and, if so, prejudicial; and, if prejudicial, whether it was corrected. To consider all the factors discussed above is to conclude that there was no legal error and, if there was some technical error, it was not prejudicial; or, if it could be considered prejudicial, it was surely obviated by comments to the jury.

We cannot agree that it is the proper function of an appellate court to seize upon some conduct or happenstance arising during the course of trial, and then, because it is contrary to our sense of propriety or concept of the niceties of trial tactics, reverse a judgment. We too are bound by the law. It is soon enough to reverse convictions resulting from fair and impartial trials, and based on overwhelming evidence of guilt, when legal prejudicial error is called to our attention. There is a point beyond which appellate courts should not go.

To reverse this conviction implies that the attorney who afforded appellant a diligent and aggressive defense has standards of professional conduct so gross that he could not recognize improper and prejudicial conduct on the part of his adversary. It implies that defense counsel was less interested in providing adequate defense of his client and in securing a fair trial than this court. Reversal on these grounds by this court would also imply that trial judges in this jurisdiction are either unaware of what constitutes a fair trial or less interested in insuring it than this court.

Even if the comments of the prosecutor may be said to have been ill-advised, and should not be condoned, and we do not agree that this is so, it is a different thing indeed to hold that his conduct was unprofessional, contrary to the Canons of Ethics, and reversible error. The administration of justice in our courts is conducted within the framework of an adversary system. In such a system it is the nature and function of opposing counsel to be partisan and to advocate his client's position with zeal and fervor within the limits of professional ethics. It has been said of prosecutors:

"As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a

---

5. However, diligent research has disclosed no case in an American jurisdiction where a conviction has been reversed on the grounds of improper argument where there was no objection at trial, no reliance on alleged misconduct in support of a motion for new trial, and where counsel did not raise the point on appeal.

wrongful conviction as it is to use every legitimate means to bring about a just one." [6]

There is nothing inconsistent with this classic statement of a prosecutor's duty and his being a forceful advocate. Once a prosecutor reasonably resolves that there is adequate basis for instituting criminal proceedings, he should be free to urge with vigor that the defendant is guilty. Indeed, so long as punishment of the guilty is an end of criminal justice as a protection of society he has the duty of forceful advocacy.[7] In his role as the people's advocate, he is not required to treat defense witnesses as Lord Chesterfield might receive a guest in his drawing-room. Returning to the fundamental rules disclosed by the cases, he may call a spade a spade, and a witness false, if in doing so he relies on the evidence and the inferences from it to support his conclusion.

We believe the following quotation well and truly (though perhaps too colorfully) summarizes the role of counsel as advocate:

"The comments thereon [certain testimony] may or may not have been logical and just, but that is something that the court cannot assume to control. Within reasonable limits, the language of counsel in argument is privileged, and he is permitted to express his own ideas in his own way, so long as they may fairly be considered relevant to the case which has been made. No lawyer has the right to misrepresent or misstate the testimony. On the other hand, he is not required to forego all the embellishments of oratory, or to leave uncultivated the fertile field of fancy. It is his time-honored privilege to—

"'Drown the stage in tears,
Make mad the guilty and appall the free,
Confound the ignorant, and amaze, indeed,
The very faculties of eyes and ears.'

"Stored away in the property room of the profession are moving pictures in infinite variety, from which every lawyer is expected to freely draw on all proper occasions. They give zest and point to the declamation, relieve the tediousness of the jurors' duties, and please the audience, but are not often effective in securing unjust verdicts. The sorrowing, 'grey-haired parents,' upon the one hand, and the broken-heart-

6. Berger v. United States, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314.

7. In United States v. Wexler, 2 Cir., 1935, 79 F.2d 526, 529–530, the court said: "He complains of the conduct of the prosecution at the trial, its intemperate denunciations, its irrelevant appeals to passion, the introduction of damaging and immaterial evidence against him. We do not forget that very recently this was made the sole basis for the reversal of a conviction (Berger v. United States * * *), and with that admonition before us we have felt bound to look somewhat jealously for any abuse of his position by the prosecuting attorney. We can find none. It is impossible to expect that a criminal trial shall be conducted without some show of feeling; the stakes are high, and the participants are inevitably charged with emotion. Courts make no such demand; they recognize that a jury inevitably catches this mood and that the truth is not likely to emerge, if the prosecution is confined to such detached exposition as would be appropriate in a lecture, while the defense is allowed those appeals in misericordiam which long custom has come to sanction. The question is always as to the particular incident challenged, in the setting of the whole trial. In the case at bar all the prosecution's arguments were, so far as we can see, supported by the evidence or by reasonable inference from it, though at times they were certainly denunciatory. * * * The comments upon the appearance and posture of the witnesses and their fears were entirely proper, if justified in fact, which we have no reason to suppose that they were not." See also Pietch v. United States, supra; Stassi v. United States, 8 Cir., 1931, 50 F.2d 526; Di Carlo v. United States, 2 Cir., 6 F.2d 364, certiorari denied, 1925, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168.

ed 'victim of man's duplicity,' upon the other, have adorned the climax and peroration of legal oratory from a time 'whence the memory of man runneth not to the contrary,' and for us at this late day to brand their use as misconduct would expose us to just censure for interference with ancient landmarks." [8]

We believe this statement casts this case in the proper perspective.

We are not unmindful that this is a capital case arising from a brutal, wanton murder. Because of its gravity we have given unusual, indeed extraordinary, attention to every facet of the circumstances. We are satisfied, as we have noted, that there is no error. Even if it could be said that there was some technical error, that upon which the majority seems to rely falls clearly within the compass of Rule 52(a), F.R.Crim.P.[9] Society has a large and legitimate interest in the efficacy of criminal conviction attained after fair and impartial trial by jury. Such a trial occurred here.

The Supreme Court, in Lutwak v. United States, 1953, 344 U.S. 604, 619–620, 73 S.Ct. 481, 490, 97 L.Ed. 593, stated:

"Was the admission of this one item of hearsay evidence sufficient to reverse this case? We think not. In view of the fact that this record fairly shrieks the guilt of the parties, we cannot conceive how this one admission could have possibly influenced this jury to reach an improper verdict. A defendant is entitled to a fair trial but not a perfect one * * *."

No reasonable jury could have been swayed from accepting Stewart's defense of insanity because of the prosecutor's remarks of which complaint has now been made. Thus, if there was error, and we reiterate that we do not think there was, it did not affect substantial rights.[10] We would affirm.

---

**8.** State v. Burns, 1903, 119 Iowa 663, 94 N.W. 238, 241.

**9.** "(a) *Harmless Error.* Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

**10.** Cf. United States v. Chieppa, 2 Cir., 241 F.2d 635, 640, where the court said:

"We think that in the particular trial setting of this case the single cryptic reference * * * to the efforts of two of the appellants to suppress evidence * * * did not affect * * * 'substantial rights' * * *. Its admission therefore was 'harmless error' within the meaning of Rule 52(a)."